UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ERIC LAWSON, Individually and on Behalf of All Others Similarly Situated, | § § § § | Civil Action No. 1:15-cv-360 |
| Plaintiff, | § § | |
| v. | § § | **JURY TRIAL DEMAND** |
| FREESCALE SEMICONDUCTOR, LTD., GREGORY L. SUMME, GREGG LOWE, KRISHNAN BALASUBRAMANIANM CHINH E. CHU, D. MARK DURCAN, DANIEL J. HENEGHAN, THOMAS H. LISTER, JOANNE M. MAGUIRE, JOHN W. MARREN, JAMES A. QUELLA, PETER SMITHAM, CLAUDIUS E. WATTS IV, FREESCALE HOLDINGS L.P., NXP SEMICONDUCTORS N.V., and NIMBLE ACQUISITION LIMITED, | § § § § § § § § § § § § § § | |
| Defendants. | § § | |

## COMPLAINT

1.     Plaintiff Eric Lawson ("Plaintiff"), by his attorneys, brings the following action individually on behalf of himself and on behalf of all the common shareholders of Freescale Semiconductor Ltd. ("Freescale" or the "Company"), other than Defendants (defined below) and their affiliates, against certain officers and members of Freescale's board of directors (the "Board" or the "Individual Defendants"), Freescale, NXP Semiconductors N.V. ("NXP"), NXP's wholly-owned subsidiary Nimble Acquisition Limited ("Nimble"), and Freescale Holdings L.P. ("Freescale Holdings") to enjoin NXP's proposed acquisition of all Freescale's outstanding common shares (and/or aiding and abetting thereof) for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and for breaches of fiduciary duties.  The

allegations in this Complaint are based on information and belief, including investigation of counsel and review of publicly available information, except for Plaintiff's own acts, which are alleged on personal knowledge.

2.     Freescale is a Bermuda exempted limited liability Company engaged in the semiconductor business operating out of Austin, Texas.  The Company designs, develops, manufactures and sells through a world-wide distribution network microcontrollers and digital networking processors, commonly called embedded processors.  As the Company describes in its SEC filings, "Embedded processors are the backbone of electronic systems, providing essential control, intelligence and security, while enhancing performance and power efficiency. We combine our embedded processors with our complementary analog, sensor and radio frequency (RF) devices, as well as a full suite of software and design tools, to provide highly integrated embedded processing solutions that streamline customer development efforts, lower their costs and shorten their time to market."

3.     On March 1, 2015, Freescale and NXP announced that they had entered into a definitive Agreement and Plan of Merger (the "Merger Agreement") under which NXP will acquire all outstanding common shares of Freescale (the "Proposed Buyout" or "Merger"). Pursuant to the Merger Agreement, Freescale shareholders will receive $6.25 in cash, without interest, and 0.3521 of NXP's ordinary shares (the "Merger Consideration"), for each share of the Company's common stock they own. The total implied per share consideration is $36.14. The Proposed Buyout is valued at approximately $11.8 billion resulting in a combined enterprise value of over $40 billion, and is expected to close in the second half of 2015.

4.     The Proposed Buyout is the culmination of the concerted effort of a group of private equity investors that collectively own approximately 64% of the Freescale's common

shares, whose representatives control the Freescale Board of Directors, and who have sought for some time to dispose of their investment.  These investors, referred to in Freescale's SEC filings as the "Sponsors," have entered into a Support Agreement agreeing to vote in favor of the Proposed Buyout ensuring the Merger is completed.  Certain of the Individual Defendants affiliated with the Sponsors (described below), acting purely for their own self-interest, also stand to reap lavish benefits and rewards from the Proposed Buyout that ordinary public shareholders will not receive. Additional protective provisions in the Merger Agreement severely hinder if not preclude other potential acquirers from topping NXP's proposal, including a whopping $600 million termination fee that applies under certain circumstances.

5.     On April 2, 2015, Freescale and NXP filed a joint preliminary Proxy Statement/Prospectus on Form F-4 Registration Statement ("Form F-4") with the SEC that provides a brief overview of the Sponsors' efforts, which fails to make all material disclosures and which contained materially misleading statements about the Proposed Buyout. As discussed in more detail below, the Form F-4 reveals just enough information to expose a flawed sales process and the selfish motivations of the Individual Defendants, but omits numerous material facts concerning the Proposed Buyout, leaving Freescale's public shareholders in the dark about this transaction. Thus, the Form F-4 omits and/or misrepresents material information concerning among other things: (i) the sales process and the process by which the highly conflicted Board of Directors entered into the Proposed Buyout, (ii) certain financial projections prepared by Freescale's management and relied on by Freescale's financial advisor Morgan Stanley & Co., LLC ("Morgan Stanley") and NXP's advisor Credit Suisse Securities (USA) LLC ("Credit Suisse") in issuing their Fairness Opinions regarding the Proposed Buyout, and (iii) the key data

and inputs underlying the financial valuation methodologies that purport to support the fairness opinion ("Fairness Opinion") provided by Morgan Stanley and Credit Suisse.

6.      As a result of the materially deficient Form F-4, Freescale's public shareholders will be unable to cast an informed vote regarding the Proposed Buyout. In issuing the materially deficient Form F-4 that omits material information and misrepresents material facts necessary to render the Form F-4 not misleading, the Company's Board of Directors (the Individual Defendants as described below) have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and have breached fiduciary duties owed to the Freescale public shareholders.

7.      For these reasons and as set forth in detail herein, Plaintiff seeks equitable relief including among other things to enjoin Defendants from taking any steps to consummate the Proposed Buyout until such time as Defendants provide all material information critical and necessary for the Company's public shareholders to cast a fair and fully informed vote on the Proposed Buyout.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under 28 U.S.C. §1331 (federal question) as Plaintiff individually asserts claims under the Exchange Act. Supplemental jurisdiction over Plaintiff's other claims asserted on a class-wide basis exists pursuant to 28 U.S.C. §1367.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Freescale maintains its primary place of business in this District.

## PARTIES

10.      Plaintiff is, and has been at all relevant times, the owner of Freescale shares and has held such shares since prior to the wrongs complained of herein.

11.     Freescale is a Bermuda exempted company with its principal executive offices located at 6501 William Cannon Drive West, Austin, Texas.  As described more fully herein, the Company designs and produces microchips for various industries, *e.g.,* the automotive industry. Freescale completed its initial public offering in 2011, and its common shares trade on the New York Stock Exchange under the symbol "FSL."

12.     Freescale Holdings L.P. ("Freescale LP") is a Cayman Island limited partnership. Approximately 64% of Freescale's outstanding common shares are owned by Freescale LP, which is controlled by a group of private equity funds, including the Blackstone Group, The Carlyle Group, funds advised by Permira Advisers, LLC, TPG Capital and others that acquired the Company in 2006.

13.     Defendant Gregory L. Summe ("Summe") has served as a member of the Board of Directors since September 2010 and as Chairman of the Board since May 2014.  Summe is Chairman of the Compensation and Leadership Committee. Summe was the Managing Director and Vice Chairman of Global Buyout at The Carlyle Group from September 2009 to May 2014. Summer served as a Senior Advisor to Goldman Sachs Capital Partners from 2008 to 2009.

14.     Defendant Gregg Lowe ("Lowe") serves as a member of the Board of Directors and  has been the Company's President and CEO since June 2012.

15.     Defendant Krishnan Balasubramanian ("Balasubramanian") has served as a member of the Board of Directors since May 2013, and also serves on the Audit and Legal Committees.

16.     Defendant Chinh E. Chu ("Chu") has served as a member of the Board of Directors since February 2011.  Chu also serves on the Compensation and Leadership Committee

and the Finance Committee. Chu is a Senior Managing Director in the Private Equity Group at The Blackstone Group.

17.     Defendant D. Mark Durcan ("Duncan") has served as a member of the Board of Directors since August 2014.

18.     Defendant Daniel J. Heneghan ("Heneghan") has served as a member of the Board of Directors since July 2010 and is Chairman of the Audit and Legal Committee and a member of the Finance Committee.

19.     Defendant Thomas H. Lister ("Lister") has served as a member of the Board of Directors since December 2006, and also serves as Chairman of the Company's Finance Committee.  Lister is Co-Managing Partner of Permira Holdings Limited and previously served as head of Permira's North American business.

20.     Defendant Joanne M. Maguire ("Maquire") has served as a member of the Board of Directors since November 2013. Maguire is also a member of our Audit and Legal Committee.

21.     Defendant John W. Marren ("Marren") has served as a member of the Board of Directors since June 2007. Marren is Chair of the Nominating and Corporate Governance Committee and a member of the Compensation and Leadership Committee and Finance Committee.  Marren joined the private equity firm TPG Capital in 2000 as a Partner and leads TPG's technology team. Prior to that, Marren was a Managing Director at the financial services firm Morgan Stanley, most recently as co-head of the Technology Investment Banking Group.

22.     Defendant James A. Quella ("Quella") has served as a member of the Board of Directors since August 2011. Quella is a member of the Nominating and Corporate Governance Committee. Quella previously served as a Senior Managing Director and Senior Operating

Partner in the Private Equity Group at Blackstone and currently serves as a Senior Advisor to the Blackstone Private Equity Group.

23.     Defendant Peter Smitham ("Smitham ") has served as a member of the Board of Directors since June 2007. Smitham is a member of the Compensation and Leadership Committee and the Nominating and Corporate Governance Committee. Smitham was a Partner at Permira until December 31, 2009, and continues to be a member of Permira Advisers LLP, which he joined in 1985.

24.     Defendant Claudius E. Watts, IV ("Watts") became a member of  the Board of Directors since December 2006.  Watts is a member of the Nominating and Corporate Governance Committee and Finance Committee.  Watts is a Managing Director with The Carlyle Group and serves as the head of Carlyle's Technology Buyout Group, focusing on buyouts and growth equity investments in large companies providing semiconductors, electronic systems, software, and software enabled services.

25.     The Defendants identified in paragraphs 13 to 24 above are referred collectively as the "Individual Defendants" or the "Board."

26.     Defendant NXP is a Dutch company that designs semiconductors and software for mobile communications, consumer electronics, security applications, in-car entertainment, and networking. NXP offers its products to the automotive, identification, wireless infrastructure, lighting, mobile, and computing applications.  NXP formerly was called Phillips Semiconductor until it was sold to a consortium of private equity investors in 2006. It 2010, NXP completed an initial public offering and began trading on the Nasdaq stock exchange under the symbol "NXPI."

27.     Defendant Nimble Acquisition Limited is a Bermuda exempted Limited Liability Company and indirect, wholly-owned subsidiary of NXP.  Nimble was created for purposes of effectuating the Proposed Transaction.

28.     The Individual Defendants, NXP, and Nimble collectively are referred to as the "Defendants."

## THE DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions with the Company as directors and/or officers, the Individual Defendants are in a fiduciary relationship with and otherwise owe Plaintiff and the other public shareholders of Freescale a duty to act honestly and in good faith and to exercise care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

30.     By virtue of their positions as directors and/or officers of Freescale, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Freescale to engage in the practices complained of herein.

31.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Buyout, violated duties owed to Plaintiff and the other public shareholders of Freescale, including their duties of loyalty, good faith, and skill and care and violated said duties by engaging in the actions described herein among including by preparing, filing and disseminating the false and misleading Form F-4.

## CLASS ACTION ALLEGATIONS

32.     Plaintiff asserts certain claims on his own behalf and on behalf of a class of Freescale common shareholders pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Freescale common stock who are being and will be harmed by Defendants' actions described below (the "Class").  Excluded from the Class are Defendants

herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

33.    This action is properly maintainable as a class action because:

    a.    The Class is so numerous that joinder of all members is impracticable.  As of February 2, 2015 there were 306,338,331 shares of Freescale common stock outstanding.  The holders of these shares are believed to be geographically dispersed through the United States;

    b.    There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members. The common questions include, *inter alia*, the following:

        i.    Whether the Individual Defendants have breached their fiduciary duties and other obligations owed to Plaintiff and the other members of the Class in connection with the Proposed Buyout by virtue of their positions with the Company;

        ii.    Whether Defendants disclosed all material information regarding the Proposed Buyout;

        iii.    Whether Freescale LP, NXP, and/or Nimble aided and abetted the Individual Defendants' violations and/or breaches of duties and/or other obligations owing to Plaintiff and class members;

        iv.    Whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets or otherwise acted in bad faith, dishonestly and/or fraudulently; and

        v.    Whether Plaintiff and the other members of the Class would suffer irreparable injury if the Proposed Buyout is consummated.

    c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; and

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

A.     **Freescale's Background and Performance**

34.     Freescale is an embedded hardware manufacturer that focuses on providing products for the automotive, consumer, industrial and networking markets. Freescale's products include microprocessors, micro controllers, DSPs, power ICs, and sensors.

35.     Freescale was a division of Motorola and involved in several cutting edge technological developments including developing semiconductor devices, ground-based tracking and test equipment, and onboard tracking and communications, some of which were utilized in the Apollo space missions.  This division was spun off in 2004 as Freescale.

36.     After spinning off Freescale from Motorola, the Company struggled to become profitable. In 2006, the Company was purchased by a group of private equity investors led by the Blackstone Group. The transaction was accomplished by incurring significant debt, which the Company struggled to maintain.  Shortly after the going private transaction, sales declined. Freescale's largest customer, former parent Motorola, slashed orders and Freescale was unable to

10

add enough new customers to offset the shortfall. Revenues for 2007 tumbled 10%, to $5.7 billion, even as the industry's increased 5%.

37.     In 2011, Freescale launched the industry's first "base station-on-a-chip" for the mobile market. The product line, called the Qonverge portfolio, integrated DSP wireless acceleration, and communication processing into a single chip for femto, pico, metro, and macro cell phone base stations. The Qonverge line was designed to help the mobile market adapt to the increased demands on the cell networks for data delivery and bandwidth by providing a small, low cost, low power, and scalable solution.

38.     Although Freescale struggled with profitability, reporting an operating loss of over $400 million in 2011, it has experienced improving results, having cut losses from over $1 billion in 2010.

39.     For example, on January 27, 2015, Freescale announced its Fourth Quarter 2014 ("4Q") and Year End 2014 results. Net sales for 4Q were $1.10 billion and while that was down nine percent sequentially (due to seasonality and lower sales into both the industrial market and distribution), compared to last year, fourth quarter sales were up two percent. Product group revenue was up six percent compared to the fourth quarter last year.   Additional highlights included the following:

- For the year, net sales for the company increased 11% and product group revenue increased 16%. All five product groups' revenue grew over last year with four of the five generating double-digit growth.

- Gross margins for the quarter were 47.2 %, up from 46.3 %in the third quarter of 2014. Operating efficiencies and procurement savings contributed to the sequential *increase* in gross margin, offset by the impact of lower sales volume and a modest decline in utilization.

- Gross margins for 2014 were 45.9 %compared to 42.7 %in the prior year. Operating efficiencies and procurement savings helped contribute to the year-over-year improvement.

- Operating earnings for the fourth quarter were $178 million, compared to $215 million in the third quarter of 2014 and $145 million in the fourth quarter of 2013.

- Net earnings for 4Q were $63 million, or $0.20 per share, compared to net earnings of $125 million, or $0.40 per share, in the third quarter of 2014 and a net loss of $118 million, or a loss per share of $0.46, in the fourth quarter of 2013. Fourth quarter 2014 net earnings included the impact of $12 million of reorganization of business and other charges and $10 million of costs related to the company's redemption of $100 million of debt securities during the fourth quarter.

- Adjusted "operating earnings" (defined in Note 1 to the Consolidated Financial Information) for the fourth quarter of 2014 were $211 million compared to earnings of $243 million in the third quarter of 2014 and $174 million in the fourth quarter of 2013. For the year, adjusted operating earnings were $848 million compared to $616 million in 2013. As a percentage of sales, adjusted operating earnings improved to 18.3 percent in 2014 compared to 14.7 percent last year.

- "Adjusted net earnings" (defined in Note 1 to the Consolidated Financial Information) for the fourth quarter of 2014 were $129 million, or $0.42 per share, compared to $150 million, or $0.49 per share, in the third quarter of 2014 and $50 million, or $0.19 per share, in the fourth quarter of 2013. Adjusted earnings per share for 2014 were $1.56, compared to $0.45 in 2013.

- Adjusted net earnings benefited from significant improvements in gross margin and lower interest expense associated with the company's de-leveraging activities. During 2014, the company reduced total debt by approximately $915 million and reduced annualized interest expense by approximately $95 million. Inclusive of the $250 million debt redemption announced earlier this month, total debt will be reduced by $1.2 billion and annualized interest expense reduced by $120 million

39.    The Defendant Lowe was positive and optimistic about the Company's future

*growth* potential in his public statement:

> Freescale continues to make consistent progress in gaining market share, improving profitability and improving our capital structure…
>
> ***
>
> Our revenues grew 11 percent over  prior year and all indications are that we gained market share in 2014. Gross margins improved over the prior year and our adjusted earnings per share grew more than three times compared to the prior year. Our end market exposure, margin and earnings momentum position us well for another solid performance in 2015.

40.     Freescale's impressive performance is reflected in the chart below through the last trading day prior to the announcement of the Merger:



41.     Despite the turnaround at the Company and return to growth and profitability, Defendants have sought for some time to divest themselves of their investment in Freescale. To that end, they have long sought to sell the Company to NXP.

42.     For example, as revealed in the Form F-4 on page 51,[1] Defendants disclosed that Freescale and NXP had an existing confidentiality agreement entered into on August 14, 2013 to evaluate synergies between the companies. No further information is provided about these 2013 discussions or whether the Company engaged in discussions with any other company regarding a potential combination.  Indeed, the discussions culminating in the Proposed Buyout appear as an extension of those 2013 discussions.

---

[1] References to "p. _" are to the April 2, 2015 Form F-4 filed with the Securities and Exchange Commission ("SEC").

43.     After the Merger was announced, the Company continued to post positive financial results.  On April 23, 2015, Freescale announced its First Quarter 2015 ("1Q") results. Net sales for 1Q were $1.17 billion compared to $1.10 billion in the fourth quarter of 2014 and $1.13 billion in the first quarter of 2014.  Operating earnings for the period were $179 million, compared to $178 million in the fourth quarter of 2014 and $155 million in the first quarter of 2014. Operating earnings were in line with the prior quarter. On a year-over-year basis, operating earnings benefitted from higher sales and improving gross margins. Net earnings for the first quarter were $70 million, or $0.22 per share, compared to net earnings of $63 million, or $0.20 per share, in the fourth quarter of 2014 and a net loss of $23 million, or $(0.08) per share, in the first quarter of 2014.

44.     The Defendant Lowe expressed positive and optimistic views about the results:

> First quarter results marked another quarter of solid execution for Freescale … Revenue and earnings per share both showed strong sequential and year over year improvement. First quarter product revenue grew 6 percent year-on-year, starting off 2015 with another quarter of market share growth. In addition, the increase in gross margin represents the ninth consecutive quarter of growth in margins, and is the third quarter in a row of record gross margins.

**B.     The Proposed Buyout**

45.     On March 1, 2015 Freescale and  NXP issued a joint press release announcing the Proposed Buyout, which provides in relevant part:

> **Eindhoven, The Netherlands and Austin, Texas, March 2, 2015 (CET)** – NXP Semiconductors N.V. (NASDAQ: NXPI) and Freescale Semiconductor, Ltd. (NYSE: FSL) today announced that they have entered into a definitive agreement under which NXP will merge with Freescale in a transaction which values the combined enterprise at just over $40 billion. The merger creates a high performance mixed signal semiconductor industry leader, with combined revenue of greater than $10 billion. The merged entity will become the market leader in automotive semiconductor solutions and the market leader in general purpose microcontroller (MCU) products. The combined company will capitalize

14

on the growing opportunities created by the accelerating demand for security, connectivity and processing.

"Today's announcement is a transformative step in our objective to become the industry leader in high performance mixed signal solutions. The combination of NXP and Freescale creates an industry powerhouse focused on the high growth opportunities in the Smarter World. We fully expect to continue to significantly out-grow the overall market, drive world-class profitability and generate even more cash, which taken together will maximize value for both Freescale and NXP shareholders," said Richard Clemmer, NXP Chief Executive Officer. Mr. Clemmer will continue to be the President and Chief Executive Officer of the merged company.

"We believe this merger, which combines two highly successful and complementary companies, will create significant value for Freescale's and NXP's shareholders, customers and employees. Both companies have built leadership positions and have a sharp focus on delivering superior value to customers. Our combined scale, size and global reach will position our new company to deliver sustainable above market growth. It will also serve to accelerate the strategic plans both companies have invested in, enabling us to deliver more complete solutions to customers," said Gregg Lowe, Freescale Semiconductor President and Chief Executive Officer.

The transaction is expected to be accretive to NXP non-GAAP earnings and non-GAAP free cash flow. NXP anticipates achieving cost savings of $200 million in the first full year after closing the transaction, with a clear path to $500 million of annual cost synergies.

Under the terms of the agreement, Freescale shareholders will receive $6.25 in cash and 0.3521 of an NXP ordinary share for each Freescale common share held at the close of the transaction. The purchase price implies a total equity value for Freescale of approximately $11.8 billion (based on NXP's closing stock price as of February 27, 2015) and a total enterprise value of approximately $16.7 billion including Freescale's net debt.

The transaction is expected to close in the second half of calendar 2015. NXP intends to fund the transaction with $1.0 billion of cash from its balance sheet, $1.0 billion of new debt and approximately 115 million NXP ordinary shares. Post transaction, Freescale shareholders will own approximately 32 percent of the combined company.

The transaction has been unanimously approved by the boards of directors of both companies and is subject to regulatory approvals in various

jurisdictions and customary closing conditions, as well as the approval of NXP and Freescale shareholders.

Credit Suisse acted as exclusive financial adviser to NXP, along with Simpson Thacher & Bartlett and De Brauw Blackstone Westbroek, who served as legal advisers. Credit Suisse is also providing committed financing for the transaction. Morgan Stanley acted as exclusive financial adviser to Freescale, along with Skadden, Arps, Slate, Meagher & Flom who served as legal advisor.

46.     The Proposed Buyout is a result of a woefully inadequate process to sell the Company to NXP, conducted by the Individual Defendants solely to enrich themselves to the detriment of Freescale's public shareholders.

47.     As described in the Form F-4, the Defendants have discussed a combination of the two companies for years as Lowe and NXP's CEO, Richard Clemmer ("Clemmer"), have personally discussed the issue. Those discussions, originally begun as far back as 2013, picked up again November 2014, and were quickly on a fast track to completion after an in-person meeting in Austin, Texas on December 19, 2014. This despite the show of interest and several offered "indications of interest" by at least one other company that submitted several increasing proposals to the Board.

48.     Thus, in early 2014, Company A, contacted  Lowe to discuss its possible interest in a transaction with Freescale, which was reported to the Board. Those discussions did not continue at that time.

49.     In mid-July 2014, the financial advisor of Company B, a public strategic acquirer, contacted an undisclosed Freescale director to discuss Company B's interest in a possible acquisition of Freescale, and a conversation about the companies' businesses and the prospect of a business combination ensued. The director reported the conversation to Lowe and the other

members of the Freescale board, and Lowe was authorized to engage in discussions with Company B to explore the opportunity.

50.     In early September 2014, the CEO of Company B contacted Lowe to continue the discussions that had started in mid-July. Company B and Freescale executed a confidentiality agreement on September 26, 2014 for the purpose of furthering these discussions, and representatives of the management teams of Company B and Freescale participated in initial due diligence meetings on September 30, 2014 in Santa Clara, California.

51.      On September 22, 2014, the Freescale Board's five-member finance committee, which from time to time reviews and evaluates material Freescale transactions, met to discuss Freescale's strategic options, including a potential sale of the company to a third party. Representatives of Morgan Stanley presented preliminary financial analyses of potential business combinations between Freescale and several public strategic acquirers, including Company A, Company B and NXP.

52.     On October 2, 2014, Company B verbally expressed an interest in acquiring Freescale at a price representing a 25% premium to Freescale's then current share price consisting of a combination of one-half cash and the other half in Company B stock. On this date, the closing price of Freescale common shares was $18.84 per share.

53.     On October 9, 2014, the Freescale finance committee met to discuss Company B's verbal expression of interest.  Morgan Stanley provided a preliminary analysis of valuation matters and discussed third parties that potentially could be interested in an acquisition of Freescale, including Company A, Company B and NXP.

54.     On November 5, 2014, an undisclosed director of Freescale met with Clemmer to discuss the companies' businesses and the prospect of a business combination. Following the

meeting, the director reported the conversation to Lowe and the other members of the Freescale board, including that NXP potentially was interested in a business combination with Freescale, and this was noted as a topic for an upcoming Freescale board meeting.

55.     Representatives of the management teams of Company B and Freescale participated in additional due diligence meetings on November 17, 2014 in Austin, Texas. Following these meetings, on November 26, 2014, Freescale received a non-binding indication of interest and a draft exclusivity agreement from Company B, proposing to acquire Freescale for $25.00 per share, with two-thirds of the aggregate consideration payable in cash and one-third of the aggregate consideration payable in Company B stock based on a fixed exchange ratio. On this date, the closing price of Freescale common shares was $21.80 per share.

56.     On December 3, 2014, the Freescale board met to discuss Company B's indication of interest and authorized the engagement of Morgan Stanley as financial advisor and Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden Arps") as legal counsel to assist Freescale with an evaluation of a potential transaction with Company B. The Freescale board also discussed NXP's potential interest in a transaction and authorized members of Freescale's management team to engage in discussions with NXP.  Morgan Stanley provided a preliminary analysis of valuation matters and discussed third parties that potentially could be interested in an acquisition of Freescale. Following the Freescale board meeting, at the direction of the Freescale board, Morgan Stanley contacted Company B to convey Freescale's preliminary expectations regarding the financial terms of an acquisition of Freescale by Company B.

57.     On December 12, 2014, the Freescale Board met to further discuss Company B's indication of interest and potential responses to the indication of interest. Following this meeting, and at the direction of the Freescale Board, on December 14, 2014, Morgan Stanley contacted

Company B's financial advisor to indicate that Freescale would be interested in continuing discussions regarding a potential business combination in the event that Company B were to improve its proposal with an increased price of $28.00 per share, consisting of a combination of 50% cash consideration and 50% stock consideration, with no exclusivity.

58.     On December 18, 2014, Freescale received a revised non-binding indication of interest from Company B, proposing to acquire Freescale for $26.00 per share, with 50% of the aggregate consideration payable in cash and 50% of the aggregate consideration payable in Company B stock based on a fixed exchange ratio. On this date, the closing price of Freescale common shares was $24.49 per share. The revised indication of interest contained a lock-up proposal whereby one-third of the stock consideration payable to certain Freescale shareholders would be subject to restrictions on transfer until three months after closing, another one-third would be subject to such restrictions until six months after closing, and the final one-third would be subject to such restrictions until nine months after closing.

59.     On December 19, 2014, members of Freescale's management met with representatives of NXP's management in Austin, Texas to discuss the companies' performance, strategic fit and potential synergies under conditions of confidentiality based upon a confidentiality agreement that the parties had entered into on August 14, 2013 for the purpose of evaluating potential synergies between the companies.

60.     On December 20, 2014, the Freescale Board's finance committee met to discuss the revised indication of interest from Company B and the status of discussions with NXP. The finance committee authorized Freescale's management team to continue negotiations with Company B and to enter into a new confidentiality agreement with NXP reflecting the present

context. On December 22, 2014, Freescale and NXP entered into a new confidentiality agreement for the purpose of furthering the parties' consideration of a business combination.

61.     On December 23, 2014, Freescale's management met with representatives of NXP's management in San Jose, California to further discuss the companies' strategic fit and potential synergies.

62.     On December 29, 2014, Clemmer informed the NXP board of Freescale's interest in exploring a possible business combination with NXP. The NXP board concluded that it supported further due diligence of a possible combination of NXP and Freescale, including an evaluation of potential revenue and cost synergies. The NXP board also authorized engaging a financial advisor to assist NXP in connection with a possible business combination.

63.     On the same day, at a meeting of the Freescale Board, the potential transactions with Company B and NXP were evaluated further. In particular, the Freescale Board reviewed potential antitrust issues with respect to a business combination with NXP. Based on input from its advisors, the Freescale Board determined that antitrust authorities could potentially require a divestiture of the power radio frequency ("RF") business as part of obtaining necessary regulatory approvals of a transaction with NXP. The Freescale Board also discussed contacting other parties besides Company B and NXP that might be interested in a business combination with Freescale and planned to contact those parties in January. Later that day, Clemmer contacted Lowe to propose a business combination between the two companies. Without proposing a specific price, Clemmer proposed a merger of equals transaction at a price that would reflect a nominal premium to Freescale's then current share price. Clemmer expressed that NXP would be interested in commencing detailed financial and business due diligence. On this date, the closing price of Freescale common shares was $25.52 per share. In the first week of

January, 2015 representatives of Freescale's management team met with representatives of NXP's management team to discuss the areas of diligence that NXP had identified.

64.     In early January 2015, NXP engaged Credit Suisse as financial advisor and Simpson Thacher & Bartlett LLP ("Simpson Thacher") and De Brauw Blackstone Westbroek N.V. ("De Brauw") as legal advisors in connection with an evaluation of a potential transaction with Freescale.

65.     On January 5 and January 6, 2015, Freescale and NXP management and their respective financial advisors met to discuss potential synergies in further detail. Both companies concluded as a result of the meeting that the cost synergies could amount to $200 million in the first full year after closing a transaction, with a path to $500 million of annual cost synergies. On January 6, 2015, Freescale management had a conference call with Company B to preview Freescale's anticipated earnings for the first quarter of 2015.

66.     On January 8, 2015, Company B delivered a further revised non-binding indication of interest to Freescale, proposing to increase its purchase price per share to $27.00, with the other aspects of its prior proposal remaining the same, except that the proposal was conditioned on a commitment to announcing a transaction by no later than February 25, 2015. On this date, the closing price of Freescale common shares was $26.54 per share. On the following day, at the direction of the Freescale Board, Morgan Stanley contacted Company B seeking to increase Company B's proposed price.

67.     On January 10, 2015, the Freescale Board met to discuss the potential transactions with Company B and NXP as well as Company B's further revised indication of interest. Following the meeting, the Freescale Board authorized Morgan Stanley to contact Company B to arrange additional due diligence sessions and to grant Company B access to a data room

established by Freescale. On January 12, 2015, Freescale granted Company B access to the data room, and during the weeks of January 12 and January 19, 2015, representatives of Freescale and Company B participated in business and legal due diligence calls and meetings. During this time, at the direction of the Freescale board, Morgan Stanley and Lowe contacted other public strategic acquirers that Morgan Stanley, together with the Freescale Board, had identified as potential candidates for a transaction, referred to herein as Company C, Company D and Company E, to inquire whether any of such parties would be interested in an acquisition of Freescale. Morgan Stanley also contacted Company A for this purpose. On January 23, 2015, in response to the initial inquiry, Company E expressed that it had no interest in a transaction at that time. The other third parties expressed interest in learning more about the opportunity.

68.     On January 15, 2015, NXP management updated the NXP board on the potential transaction with Freescale. On January 21, 2015, the NXP board met to discuss various aspects of the potential transaction with Freescale, including transaction opportunities and risks, the time commitment that would be required of management and relative ownership scenarios for NXP shareholders and Freescale shareholders in the combined company. This meeting was attended by Credit Suisse, which discussed with the NXP board certain preliminary financial aspects of a potential transaction. Following such discussion, the NXP board authorized the submission of a non-binding indication of interest to Freescale and for management to discuss with Freescale and its representatives.

69.     On January 22, 2015, NXP delivered to Freescale a non-binding indication of interest, proposing to acquire all Freescale common shares in an all-stock transaction at a fixed exchange ratio reflecting a 6% premium to the trailing 10-trading day average exchange ratio of Freescale common shares and NXP ordinary shares, calculated based on the closing prices of

Freescale common shares and NXP ordinary shares ending three trading days prior to the signing of definitive transaction agreements, except that the exchange ratio would not be less than 0.334x or exceed 0.366x. NXP also proposed that Freescale would have representation on the combined company's board proportionate to Freescale shareholders' combined company ownership, subject to NXP maintaining its status as a foreign private issuer. On this date, the closing price of Freescale common shares was $26.01 per share and the closing price of NXP ordinary shares was $79.06 per share

70.     The Freescale Board met on January 26, 2015, along with members of Freescale's management to receive an update on the status of Company B's due diligence review and to consider the terms of NXP's indication of interest.   Morgan Stanley reported that, in a conversation following NXP's delivery of its indication of interest, Clemmer verbally indicated a willingness to modify the terms of its proposal to offer part cash consideration in order to provide additional transaction price certainty and downside protection for Freescale shareholders. At the meeting, representatives of Morgan Stanley also updated the Freescale board regarding the status of other third party interest in Freescale. On the same day, Freescale granted NXP access to Freescale's data room.

71.     On January 28, 2015, the first full day of trading following the release of Freescale's 2014 fourth quarter earnings, the closing price of Freescale common shares was $31.16 per share. On January 28, 2015, Companies C and D each entered into a confidentiality agreement with Freescale for the purpose of furthering transaction discussions.

72.     On January 29, 2015, Morgan Stanley and Freescale executed an engagement letter, indemnification letter and confidentiality agreement with respect to Freescale's consideration of a sale transaction.

73.     On January 30, 2015, Company A entered into a confidentiality agreement with Freescale for the purpose of furthering transaction discussions. None of the confidentiality agreements that Freescale entered into with Companies A, B, C, D or NXP had standstill provisions. In early February 2015, Freescale conducted management presentations for Companies A, C and D.

74.     On February 3, 2015, members of Freescale's management, representatives of Morgan Stanley and representatives of the sponsor shareholder met with members of NXP's management team, with representatives of Credit Suisse in attendance, to perform a due diligence review of NXP. On the same day, Freescale provided an initial draft of the merger agreement to NXP and its counsel. Among other things, the merger agreement contemplated part cash and part stock consideration, as well as terms favorable to Freescale in respect of allocating risks associated with obtaining regulatory approvals given the companies' competitive overlap in the RF business.

75.     On February 4, 2015, Company A expressed that it had no interest in further considering a transaction due to insufficient strategic fit between the companies. The Freescale Board on February 4, 2015, and received an update from Freescale's management and Morgan Stanley regarding the ongoing discussions with NXP, Companies C and D. Morgan Stanley also reported to the Freescale board that Company B had indicated it planned to complete its due diligence over the next few weeks. The Freescale board also discussed potential alternative transactions in the event that an acquisition of the company did not materialize, including the possibility of an acquisition by Freescale of another company in the industry and the possibility of a primary or secondary offering of Freescale's equity interests.

76.     On February 7, 2015, Freescale and NXP executed a written joint defense agreement in anticipation of sharing information related to the companies' RF businesses to identify areas of overlap. On February 13, 2015, Freescale and NXP executed a "clean team" agreement identifying the personnel who would be permitted to review competitively sensitive information of the parties.

77.     In the evening of February 12, 2015, an article appeared in the New York Post speculating that Freescale was in discussions regarding a possible sale. On this date, the closing price of Freescale common shares was $34.70 per share. On the following day after the article appeared, the closing price of Freescale common shares was $37.53 per share.

78.     On February 13, 2015, after a board meeting, NXP delivered to Freescale a revised draft of the merger agreement, and an initial draft of the support agreement. The principal issues raised in the revised draft merger agreement included the parties' termination rights and related fees payable upon termination of the merger agreement, required efforts of NXP to obtain regulatory approvals for the merger, and provisions relating to NXP's financing.

79.     On February 17, 2015, a "clean room" was opened in the Freescale data room made available to NXP for the purpose of facilitating an assessment of the potential regulatory issues involved in a transaction between the parties.  On February 17, 2015 and February 18, 2015, members of Freescale's management team had separate diligence meetings with members of the management teams of Companies C and D. On February 19, 2015, the Freescale Board held a meeting to review developments involving Freescale's discussions with NXP, Companies C and D. Freescale management noted that discussions with Company B had ceased following Freescale's earnings call for the fourth quarter of the 2014 fiscal year. The Freescale Board directed Freescale's management and representatives of Skadden Arps to prepare a revised draft

merger agreement and draft disclosure schedules that could be delivered to NXP following an NXP board meeting on February 24, 2015, in anticipation that NXP would be in a position following such meeting to present an updated indication of interest representing NXP's best proposal.

80.     On February 20, 2015, Company D expressed that it had no interest in further considering a transaction at that time, as it was not prepared to proceed with a significant transaction in a timeframe that would likely be acceptable to Freescale. On February 24, 2015, Company B contacted Morgan Stanley to request that Company B's access to the Freescale data room be terminated because Company B was no longer interested in considering a transaction with Freescale.

81.     On February 24, 2015, the NXP board met and discussed the proposed transaction with Freescale, including the merger consideration to be offered and the potential benefits and risks of the merger for NXP and its stakeholders. The NXP management team made a presentation to the NXP board regarding the business, financial, tax, legal (including with respect to antitrust issues) and other aspects of the proposed transaction, the outcome of management's due diligence review of Freescale and the principal terms of the merger agreement and other transaction, the outcome of management's due diligence review of Freescale and the principal terms of the merger agreement and other transaction documentation. Credit Suisse discussed with the NXP board certain preliminary financial aspects of the proposed transaction. De Brauw, Dutch legal counsel to NXP, discussed with the directors their fiduciary duties to NXP and its stakeholders in considering the transaction and that, when considering the transaction, the directors should weigh the interest of NXP's shareholders, employees and creditors, as well as suppliers and long-term customers that depend on NXP.

82.     The NXP board then unanimously resolved that the merger agreement and the merger were advisable, fair to and in the best interests of NXP and its stakeholders, approved submitting a revised non-binding indication of interest to Freescale, and formed and authorized a special committee of members of the NXP board for the purpose of approving the final terms of the transaction and related documentation, subject to satisfactory resolution of outstanding items, including satisfactory negotiation of then outstanding material transaction terms and receipt by the NXP board of a favorable opinion from Credit Suisse regarding the fairness, from a financial point of view, to NXP of the consideration to be paid by NXP pursuant to the merger agreement.

83.     On February 25, 2015, NXP delivered to Freescale a revised non-binding indication of interest, proposing to acquire all Freescale common shares in a cash and stock transaction consisting of a fixed exchange ratio of 0.3521 of an NXP ordinary share plus $6.25 in cash for each outstanding Freescale common share. The proposal represented total value of $36.50 per Freescale common share (based on the closing price of NXP ordinary shares of $85.91 on February 24, 2015), which represented a 10% premium over the 10-day average Freescale common share trading price prior to the article in the New York Post speculating about Freescale sale discussions, and a 36% premium to Freescale common share's closing price prior to NXP's previous letter. On this date, the closing price of Freescale common shares was $36.29 per share and the closing price of NXP ordinary shares was $84.90 per share.

84.     On the same day, the Freescale Board met to review NXP's revised indication of interest and the status of Company C's interest in a transaction with Freescale. Morgan Stanley noted, based upon its conversations with representatives of NXP, that NXP was prepared to proceed quickly, with a proposed transaction announcement around March 2, 2015. The Freescale Board directed management and representatives of Skadden Arps to deliver to NXP

the revised merger agreement and draft disclosure schedules they had prepared and to commence negotiations. Regarding the status of Company C's interest in a transaction with Freescale, representatives of Morgan Stanley noted that Company C was scheduled to hold an internal meeting on February 27, 2015 to determine whether or not to proceed with a transaction.

85.    In the evening of February 25, 2015, Skadden Arps delivered to Simpson Thacher a revised draft merger agreement and support agreement, as well as an initial draft of Freescale's disclosure schedules. On February 26, 2015, representatives of Freescale, NXP and their respective advisors held a conference call to negotiate the key issues remaining in the transaction documents. On the same day, NXP delivered a draft of the debt commitment letter it intended to enter into with Credit Suisse, Credit Suisse AG, Cayman Islands Branch ("CS") to refinance Freescale's existing debt and to finance a portion of the cash portion of the merger consideration.

86.    The Form F-4 provides that NXP intends to fund the cash portion of the Merger Consideration with a combination of cash on hand and debt financing, and also intends to refinance certain of Freescale's existing indebtedness with debt financing. NXP also may access various financing sources to provide for such debt financing (the "debt financing"). Pursuant to a debt commitment letter dated March 1, 2015, as amended by a joinder agreement dated March 10, 2015   (the "debt commitment letter") entered into among NXP B.V., a wholly-owned subsidiary of NXP, and CS, Morgan Stanley Senior Funding, Inc., Barclays Bank PLC, Deutsche Bank Securities Inc., Deutsche Bank AG New York Branch, Merrill Lynch, Pierce, Fenner & Smith Incorporated and Bank of America, N.A. (together with CS, the "lead arrangers" and each, a "lead arranger"), and Goldman Sachs Lending Partners LLC, Citigroup Global Markets Limited, Citibank N.A., London Branch and Coöperatieve Centrale Raiffeisen-Boerenleenbank BA. (the "co-managers" and each, a "co-manager") NXP B.V., as borrower, and NXP Funding

LLC, a wholly owned subsidiary of NXP B.V., as co-borrower, may enter into new term loan facilities, which as of the date of this joint proxy statement/prospectus are committed for up to $6.5 billion. In addition, NXP and NXP B.V., each as a borrower, and any other borrowers that may be party thereto, may also enter into a new revolving credit facility, which would be provided pursuant to the debt commitment letter, for up to $600 million, and which may replace existing credit facilities, in whole or in part. NXP may also access other financing sources, such as senior notes or convertible notes, or use cash on hand, as an alternative to or to supplement the above sources. (p. 14-15).

87.     Between February 26, 2015 and March 1, 2015, representatives of Simpson Thacher and Davis Polk & Wardwell LLP, counsel to CS in connection with the proposed financing, negotiated and finalized the terms of the debt commitment letter.  That financing includes potential $600 million revolving credit facility.

88.     On February 27, 2015, Simpson Thacher delivered to Skadden Arps a further revised draft merger agreement and support agreement. Between February 27, 2015 and March 1, 2015, the parties continued to exchange drafts of these and the other agreements contemplated by the Merger Agreement, referred to in the Form F-4 "transaction documents," as well as the disclosure schedules of both parties, and, in meetings in New York City attended by representatives of Freescale and NXP and their respective advisors, negotiated resolutions to the remaining open issues in the Proposed Buyout. The principal remaining issues were related to deal certainty and Freescale's remedies in the event of a failure to obtain regulatory approvals.

89.     On February 28, 2015, Company C conveyed that it was no longer interested in further considering a transaction due to "insufficient strategic fit" between the companies.

90.     On March 1, 2015, the special committee of the NXP board held a meeting, also attended by a majority of the other members of the NXP board. Representatives of NXP management updated the special committee and the other NXP board members in attendance on the outcome of the negotiations with Freescale. Also at this meeting, Credit Suisse reviewed with the special committee of the NXP board its financial analysis of the Merger Consideration and rendered an oral opinion, confirmed in writing on March 1, 2015 to the NXP board, that the merger consideration was fair to NXP. The special committee then approved the Proposed Buyout transaction and the execution of the Merger Agreement and other transaction documents and performance of the obligations and actions and the carrying out of the transactions contemplated in the Merger Agreement.

91.     On the same day, Morgan Stanley presented to the Freescale Board its financial analyses of the consideration to be received in the Proposed Buyout and orally rendered its opinion, confirmed in writing on March 1, 2015, that the Merger Consideration was fair from a financial point of view to the holders of Freescale common shares.  The Freescale Board, after the Morgan Stanley presentation and a presentation by counsel, unanimously approved the Proposed Buyout.

92.     On March 1, 2015, all the executed transaction documents, including the commitment letter, were exchanged and delivered, followed by the joint press release discussed above announcing the Proposed Buy Out.

**C.**     **The Incomplete & Materially Misleading Proxy**

93.     On April 2, 2015, NXP filed the Form F-4, with the Company's preliminary Proxy Statement and NXP's preliminary prospectus, with the SEC in connection with the Proposed Buyout.  Although required under Section 14(a) of the Exchange Act, and regulations thereunder, and with respect to the Individual Defendants their fiduciary duties to Freescale

shareholders, the Form F-4 fails to provide the Company's shareholders with material information concerning both the process leading up to the consummation of the Merger Agreement, financial information concerning Freescale, and the financial analyses Morgan Stanley and Credit Suisse performed in support of their Fairness Opinions. As a result of the incomplete and misleading Form F-4, absent the equitable relief sought herein, Freescale's shareholders will be unable to make an informed decision concerning whether to vote for or against the Merger.

      **i.**        **Materially Incomplete and Misleading Disclosures Concerning the Background of the Proposed Buyout**

94.      The Form F-4 fails to provide material information concerning the process conducted by the Board and the events leading up to the signing of the Merger Agreement. The information described below, which is not in the Form F-4, is material and necessary for Freescale shareholders to be able to analyze the process leading to the Proposed Buyout, including the extent of potential conflicts if any that may have impacted negotiations with other potential acquirers and the Merger Consideration, so that they can make an informed decisions regarding the vote. In particular, the Form F-4 fails to disclose the following information:

      a.      The extent of the discussions in 2013 (p. 51) between the Company and NXP regarding synergies, whether NXP and Freescale had engaged in any economic discussions regarding a potential combination of the entities during that time frame, whether financial advisors were involved in the strategic discussions, whether employment matters were discussed during this time frame involving any of the Individual Defendants, whether any other companies were contacted and similarly entered into confidentiality

agreements, and the outcome of the 2013 discussions with NXP and other entities (if any);

b.   The identity of the "director" who was contacted by Company B in mid-July 2014  (p. 50), the "director" who had discussions with Clemmer on November 5, 2014 (p. 51);

c.   The composition of the Freescale Board's five-member finance committee in September 2014 and the duties and responsibilities of the finance committee (p. 51);

d.   The nature of Morgan Stanley's relationship with Freescale in September and November of 2014 when it was analyzing and discussing with the Freescale Board of Directors, the Company's discussions with Companies A, B and NXP although Morgan Stanley was not engaged until January 29, 2015 (pp. 51 and 53);

e.    The Freescale Board's preliminary expectations regarding the financial terms of an acquisition of Freescale by Company B, was expressed at the December 3, 2014 board meeting (p. 51);

f.    The basis for selecting companies C, D, and E as potential acquirers of Freescale on January 10, 2015 (pp. 52-53) and whether the Board or Morgan Stanley identified any other companies and/or financial entities as potential acquirers, whether efforts were made to contact those other entities and if no efforts were made the basis for excluding them from being contacted;

g.  Identification of and role played by the members of the "sponsor shareholder" who met on February 3, 2015, with members of Freescale's management, Morgan Stanley members of NXP's management team, and Credit Suisse to perform a due diligence review of NXP (p. 54);

h.   Disclose the time frame that was conveyed to Companies A, B, C, D and E for completion of a strategic transaction, as reflected in the Form F-4 on February 20, 2015 (p. 55);

i.  The rational why the Freescale Board failed to designate a special committee to conduct and/or be responsible for the sales process during negotiations with NXP and other potential acquirers of the Company;

j.  Disclose additional substance of negotiations concerning the confidentiality agreements with the other potential acquirers and the basis for excluding any standstill provisions in the confidentiality agreements;

k.  According to the Form F-4, certain undisclosed Freescale directors and/or officers, up to two, will serve on the board of directors of the combined entity (p. 15), and there must be disclosure of who those individuals will be, when the subject of continuing service on the NXP board of directors was first discussed and when those discussions were concluded, as well as the timing and terms of all compensation matters regarding the continued service and/or employment of those Freescale individuals;

l.  Disclosure of all terms of compensation and other benefits the Individual Defendants will receive as part of the Proposed Buyout and when

discussions of those benefits occurred including but not limited to the "Freescale Compensation Proposal";

m.     The terms of all debt financing that is funding the cash portion of the Merger Consideration, including Individual Defendants' efforts to conduct due diligence into and/or any other effort to review the terms of the debt financing and debt commitment by NXP (including the refinancing of Freescale debt) to fund the cash portion of the Merger Consideration and when the Board first became aware that NXP would rely on such debt financing as part of the Proposed Buyout.  The Defendants further must disclose whether any of the other potential acquirers discussed in the Form F-4 (Companies A, B, C, D, and E) indicated that debt financing would be utilized to fund any portion of a combination with those entities;

n.     The timing and substance of all discussions concerning the solicitation by Freescale of the holders of notes, including Senior Secured Notes due 2021 and 6.000% Senior Secured Notes due 2022, mentioned in the Form F-4 on pages 123-124.

o.     Disclosure of the basis for agreeing to a fixed ratio of 0.3521 with no collar, which as reflected in the Form F-4 already has impacted the implied per share price, which on February 24, 2015 was reportedly $36.50, but which was relied on by Morgan Stanley is $36.14.

p.     Disclosure of the Individual Defendants' rational for agreeing to the Merger Agreement provisions that impose a termination fee of $600,000,000 including the basis upon which that fee was determined.

**ii.      Materially Incomplete and Misleading Disclosures Concerning Freescale's
Financials and Morgan Stanley's Financial Analyses**

95.     While the Form F-4 discloses certain information regarding Freescale's financials
and the financial analyses Morgan Stanley performed to support its Fairness Opinion, the
information is incomplete and misleading because it fails to provide, among other things, the
information described below all of which is material and necessary for Freescale shareholders to
have a fair summary of the Company's historical and projected financials and the financial
analysis performed by Morgan Stanley:

96.     With respect to *Financial Projections Related to Freescale* (p. 67), the Form F-4
fails to disclose the following information:

a.      The basis for a compound annual growth rate ("CAGR") of 7% and
forecasted margin of 26% used by Freescale management to prepare the
7% Growth/26% Margin Case for projections of Revenue, EBITDA and
Adjusted EPS for years 2015 through 2017 (pp. 67-68), which information
is necessary for shareholders to understand the underlying assumptions
and inputs utilized by Morgan Stanley to extrapolate those metrics from
2018 to 2020 and create the 0% Growth/17% Margin Case, and Street
Case;

b.      Explanation why the three-year revenue and Adjusted EBITDA forecasts
provided by Freescale to NXP for the 7% Growth/26% Margin Case for
years 2015 through 2017 (p. 66) differ from the forecasts for the same
Case for the same years as utilized by Morgan Stanley (p. 68).   This
information is material and necessary for Freescale shareholders to have a

fair summary of the Company's historical and projected financials and the financial analysis performed by Morgan Stanley;

c.      Clarification of the treatment of stock-based compensation expense ("SBC"), which were excluded from Freescale projected EBITDA (p. 68) and treated as a cash expense for purposes of Morgan Stanley's *Discounted Cash Flow Analysis* (p. 85), whether SBC was projected and if so the amount of projections, which information is necessary for shareholders to understand SBC treatment and its impact on Morgan Stanley's analysis;

d.      Whether adjustments in addition to SBC and non-recurring expenses were made to EBITDA (p. 68). This information is material and necessary because the Form F-4 fails to identify EBITDA as "adjusted" when non GAAP adjustments appear to have been used to project this metric;

e.      Clarification of whether and to what extent Freescale net operating losses ("NOLs") and/or tax benefits from NOLs were reflected in Freescale management's or Morgan Stanley forecasts of Freescale financial metrics or otherwise utilized by Morgan Stanley in rendering its Fairness Opinion (as they were utilized by NXP, see p. 72, 76). This information is material and necessary for Freescale shareholders to have a fair summary of the financial analysis performed by Morgan Stanley;

f.      Disclosure of projected unlevered free cash flows, which are not disclosed as a separate line item in the Form F-4, which information is necessary for

Freescale shareholders to have a fair summary of the financial analysis performed by Morgan Stanley;

g.      A full and complete definition of EBITDA (p. 68);

h.      Clarification of the basis why Freescale 2015 estimated EBITDA  and EPS projections provided to NXP were updated, including date such projections were updated (p. 67).

97.    With respect to Morgan Stanley's *Public Trading Valuation Analysis* (p. 83), the Form F-4 must disclose: (i) inputs and/or adjustments to calculate EBITDA to reach AV/EBITDA multiples to the extent the EBITDA calculation differs from the calculation provided on the F-4 page 68; and (ii) the implied AV/EBITDA multiples observed for the selected companies. This information is material and necessary because absent disclosure of the information, shareholders have to way to gauge the weight of the representative range of multiples of 10.5x to 13.5x that are disclosed.

98.    With respect to Morgan Stanley's *Discounted Equity Valuation Analysis* (p. 83-85), the Form F-4 fails to disclose: (i) the rationale for applying discount rate of 10.1% to determine the present value of Freescale implied future trading prices of common shares as a function of calendar year 2020 EBITDA and price to earnings ratios as a stand-alone entity; (ii) the rationale for applying discount rate of 9.4% to determine the present value of Freescale implied future trading prices of common shares as a function of calendar year 2020 EBITDA and price to earnings ratios  based on completion of the Buy Out and other assumptions (p. 84 and 85); (iii) the rational for the selection of the 2020 EBITDA multiples range of 10.5x to 13.5x as a stand-alone entity and post-Buy Out; (iv) the rational for the selection of the 2020 price to earnings multiples range of 14.5x to 19.5x as a stand-alone entity and post-Buy Out.

99.     With respect to Morgan Stanley's *Discounted Cash Flow Analysis* ("DCF"), the Form F-4 fails but must disclose for both the Freescale standalone scenario and the combination of Freescale and NXP (pp. 85-86): (i) the rationale for applying discount rates of 7.9% to 9.9%; (ii) whether the weighted average cost of capital ("WACC") was derived through the capital asset pricing model ("CAPM"), and if so disclose the market assumptions (i.e., risk free rate, two year beta, and equity risk premium); and (iii) the implied terminal multiples corresponding to the assumed growth rates of 2-3% and the source from which the terminal values were obtained.

100.    With respect to Morgan Stanley's *Precedent Transaction Analysis* (pp. 86-87), the Form F-4 fails but must disclose the following material information: (i) the implied AV/EBITDA for the next twelve month ("NTM") multiples observed for the selected transactions because absent disclosure of the information, shareholders have to way to gauge the weight of the representative range of multiples of 10.5x to 15.0x; and (ii) whether and to what extent the transactions considered were accretive to earnings and cash flow and reflected costs synergies, similar to the accretive impact the Proposed Buyout will have on Freescale and NXP's combined earnings and free cash flow and costs synergies of up to $500 million (see e.g., p. 62).

101.    Although Freescale and NXP discussed the accretive impact and synergistic value the Proposed Buyout has during both the "sales process," and the press release related to the Merger, Defendants must disclose the basis for arriving at the accretive and cost synergies valuations including the bases and assumptions pertaining to the accretion/dilution analysis.

### iii.     Materially Incomplete and Misleading Disclosures Concerning Credit Suisse's Financial Analyses

102.    The Form F-4 must disclose the assumptions and basis for calculating the "adjusted Freescale forecast" which is comprised of Freescale management's 7%Growth/26%

Margin Case for 2015 through 2017 as adjusted by Credit Suisse and Credit Suisse's extrapolation of those projections through 2020 (p. 66).

103.    With respect to Credit Suisse's *Freescale Financial Analysis* (p. 74), Credit Suisse in its *Precedent Transaction Analysis,* (p. 75) relies on numerous transactions that at least four years or older, which are not comparable to the Proposed Buyout. The Form F-4 must disclose the rationale for using transactions that appear outdated and whose inclusion weighted down and lowered the observed multiples and the resulting valuations associated with this methodology.

104.    With respect to Credit Suisse's *Discounted Cash Flow Analysis* (p. 76), the Form F-4 discloses that the estimated present value of Freescale's NOLs and certain other tax attributes expected by Freescale management to be utilized were relied on by Credit Suisse, but nowhere are the Freescale projected NOLs and the resulting tax benefits and their impact on a cash flow build for purposes of projecting Freescale free cash flows disclosed. The Form F-4 must disclose the projected NOLs and the present value of the Freescale  projected cash flows. Additionally, Defendants must disclose (i) the rationale for Credits Suisse's use of discount rates of 7.5% to 10.0% (the same discount rates were employed by Credit Suisse to calculate NXP *Discounted Cash Flow Analysis* (p. 78) and the basis for using the same discount rates for NXP also must be disclosed), (ii) whether the weighted average cost of capital ("WACC") was derived through the capital asset pricing model ("CAPM"), and if so disclose the market assumptions (i.e., risk free rate, two year beta, and equity risk premium.

105.    In sum, the Individual Defendants have breached their fiduciary duties owed to Multimedia Games' shareholders.  The Board failed to obtain reasonable consideration for Multimedia Games' shareholders, agreed to onerous deal protection devices that may prevent the

emergence of a superior offer, failed to provide the Company's shareholders with material information concerning the Proposed Transaction that is necessary for shareholders to cast an informed vote on the Merger, and likely put their own personal interests ahead of those of Multimedia Games' shareholders while negotiating the terms of the Proposed Transaction.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff for Violations of Sections 14(a) and of the Exchange Act Against the Company, the Individual Defendants, and NXP**

106.    Plaintiff brings this Exchange Act claim on behalf of himself as an individual.

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.    Defendants have issued the Form F-4 with the intention of soliciting shareholder support for the Proposed Buyout.

109.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

110.    Specifically, the Form F-4 violates Section 14(a) and Rule 14a-9 because it omits material facts as set forth in paragraphs 90 through 102.  Moreover, in the exercise of reasonable care, Defendants should have known that the Form F-4 is materially misleading and omits material facts that are necessary to render it non-misleading.

111.    The misrepresentations and omissions in the Form F-4 are material to Plaintiff, who will be deprived of his entitlement to cast a fully informed vote if such misrepresentations

and omissions are not corrected prior to the vote on the Proposed Buyout.  As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT II

**On Behalf of Plaintiff for Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants**

112.    Plaintiff brings this Exchange Act claim on behalf of himself as an individual.

113.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114.    The Individual Defendants acted as controlling persons of Freescale within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Freescale, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Form F-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false or materially incomplete and therefore misleading.

115.    Each of the Individual Defendants were provided with or had unlimited access to copies of the Form F-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

116.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Form F-4 at issue contains the unanimous

recommendation of each of the Individual Defendants to approve the Merger. Thus, the Individual Defendants were intimately connected with and directly involved in the making of this document.

117.    In addition, as the Form F-4 sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger. The Form F-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

118.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

119.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

120.    Plaintiff has no adequate remedy at law.

## COUNT III

### On Behalf of Plaintiff and the Class Against the Individual Defendants for Breach of Fiduciary Duties

121.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth.

122.    The Individual Defendants have failed to act in good faith and have intentionally failed to fully disclose to Plaintiff and the Class all material information necessary to cast an informed shareholder vote on the Proposed Buyout.

123.    The Individual Defendants dominate and control the business and corporate affairs of Freescale, and are in possession of private corporate information concerning Freescale's assets, business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and Freescale's public shareholders which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing shareholder value.

124.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have intentionally and willfully failed to act in good faith and exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class including by failing to: (i) take steps to maximize the value of the Company to its public shareholders, (i) properly value the Company, (iii) protect against conflicts of interest, and (iv) provide all material information necessary for Freescale shareholders to make an informed decision regarding the Merger.

125.    Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

126.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which the Individual Defendants' actions threaten to inflict due and arising directly from their breach of fiduciary duties.

**COUNT IV**

**On Behalf of Plaintiff and the Class Against NXP, Freescale LP and Nimble for Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty**

127.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.    NXP, Freescale LP, and Nimble (collectively "The Entities") have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Freescale's public shareholders, and has participated in such breaches of fiduciary duties

129.    The Entities knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, the Entities rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Buyout in breach of their fiduciary duties.

130.    Plaintiff has no adequate remedy at law.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally, as follows:

A.    Declaring that Plaintiff's breach of duty claims may proceed as a Class Action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

B.    Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Buyout, unless and until the Company discloses all material information regarding the Proposed Buyout;

C.    Rescinding, to the extent already implemented, the Proposed Buyout or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.   Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants' wrongdoing;

E.   Awarding Plaintiff the costs and disbursements of this action, including reasonable allowance for attorneys' and expert fees and expenses; and

F.   Granting Plaintiff and other members of the Class such further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  May 4, 2015.                          Respectfully submitted

*/s/ Randall C. Owens*
Randall C. Owens
State Bar No. 15380700
WRIGHT & CLOSE, LLP
One Riverway, Suite 2200
Houston, Texas 77056
713-572-4321
713-572-4320 (fax)
owens@wrightclose.com


**OF COUNSEL**

Juan E. Monteverde
James M. Wilson, Jr.
**FARUQI & FARUQI, LLP**
369 Lexington Ave., Tenth Floor
New York, NY  10017
Tel:  212-983-9330
Fax:  212-983-9331
Email: jmonteverde@faruqilaw.com
        jwilson@faruqilaw.com